ABRAHAM J. KAMINSKY, Respondent-Appellant, *v.* ALBERT M. KAHN, Appellant-Respondent.

First Department, March 9, 1967.

*Milton Pollack,* attorney (*Samuel N. Greenspoon* and *Barry H. Singer* with him on the brief), for appellant-respondent.

*Samuel R. Weltz* of counsel (*Milton B. Franklin* and *Sidney O. Raphael* with him on the brief; *Raphael, Searles & Vischi,* attorneys), for respondent-appellant.

*Per Curiam.* This action arises out of a contract entered into between the parties on October 28, 1957. By such contract the plaintiff transferred all of his stock (unregistered) in Spear & Co. to the defendant as the " sole and absolute owner " subject, however, to a continued interest of the plaintiff in such stock. Such interest consisted of a right to ⅓ of any dividends declared on such stock and in the event the stock should be sold to ⅓ of

the net proceeds from the sale or sales, after defendant shall have recouped advancements made by him, pursuant to the contract.

The stock so transferred was referred to as the "Spear Equity" and it will be so referred to hereinafter. The agreement between the parties provided for the satisfaction by the defendant of the outstanding liens and judgments. Under the terms of the contract, if the defendant desired to sell any of the stock he was required to submit written evidence of a bona fide purchase offer to the plaintiff, who had the right and option to purchase the shares upon the terms set forth in the offer.

At the time the contract was made the defendant was the owner of a large block of Spear & Co. stock which he held in his own name. Subsequent to the making of the contract the defendant sold large blocks of Spear & Co. stock. Certain of the shares sold are conceded to be those of the "Spear Equity", while other shares that were sold were those that originally belonged to the defendant. Together, they amounted to more than the 793,808 shares delivered by the plaintiff to defendant under the terms of the contract. Except with respect to one sale, no prior notice of the sales was given to the plaintiff, as required by the contract.

In this accounting proceeding the plaintiff seeks to hold the defendant accountable to him for the value of the entire 793,808 shares of common stock of Spear & Co., transferred by him to defendant.

Stripped of the several peripheral issues involved, the basic question in this case is whether the defendant was obliged, if and when he did sell any Spear & Co. stock, to first sell that which was given to him by the plaintiff. The trial court held defendant chargeable as though he had sold all of the "Spear Equity".

Any fair reading of the contract imports a duty upon the defendant, if he did sell any Spear & Co. stock, to first sell the "Spear Equity". We hold this obligation to be implicit in the contract despite the fact that defendant was not a fiduciary, as we have previously determined. (*Kaminsky* v. *Kahn*, 23 A D 2d 231.)

To hold otherwise would allow the defendant to sell his own shares whenever the market was high, and to sell the "Spear Equity" shares whenever the market was low. Moreover, such a holding would allow the defendant to disregard completely the plaintiff's interest in the stock transferred, and would permit the defendant to trade in Spear & Co., generally, at will, retaining for himself any profit accruing.

Inasmuch as defendant did sell Spear & Co. stock in an amount greater than that given him by the plaintiff, it was proper to hold defendant accountable for sales of Spear & Co. stock up to the entire amount received by him from the plaintiff.

However, it is our opinion that Trial Term applied an improper measure in fixing the amount with which the defendant was chargeable. Because the defendant violated the option agreement contained in the contract, the court held him accountable for the market price, less what it would cost to register the stock. In the context of this case, such measure was improper. The testimony showed that the sale of unregistered stock, such as here involved, is worth about 30 to 60% less than registered stock traded on the exchange. A comparison of the price which this stock sold for on the exchange with the actual price received by the defendant in his several sales, reveals that the sales price was just about 30% less than the market. This conforms to the testimony as to the value of unregistered stock. Therefore, we charge the defendant only with the sales price, and the judgment should, accordingly, be modified to reduce the award to $321,152.93, with interest, such amount reflecting the actual sales price received by the defendant, as determined by Trial Term.

Other questions are raised, but only several need be mentioned. Trial Term found that, as to 100,000 shares which were sold to Satnick & Co., the option notice given pursuant to the contract was defective and, therefore, charged defendant for the market price, less cost to register. While the question as to whether the option agreement was complied with need not be determined in view of our holding that the defendant is accountable only for the sales price, we do hold, as does the entire court, that the notice given was sufficient and complied with the requirements of the contract.

The defendant also questions Trial Term's determination charging him for the sale of Spear & Co. stock, owned by Acme-Hamilton Corporation. The amount of shares involved is 77,785. If we were to exclude these sales from the amount of approximately 850,000 shares of Spear & Co., which the trial court found defendant sold, then the defendant would be accountable to the plaintiff for approximately 772,215 shares (850,000 minus 77,785) instead of the 793,808. However, we hold that it was proper to charge the defendant with the sale of stock owned by Acme-Hamilton. Trial Term found that that corporation was controlled by defendant and was his alter ego. The finding is supported by the evidence.

Finally, defendant argues that he should be awarded interest which he asserts he had to pay on money he borrowed to pay the judgment owing to Southern Bedding. This is the only expense which defendant puts in issue as not having been awarded to him by the trial court. He is not entitled to repayment of such interest because the contract expressly provides that defendant is to be credited for "all sums paid by [him] to Southern under the Southern Agreement, *without** [him] charging interest."

Accordingly, the judgment dated March 22, 1966 should be modified on the law and on the facts to reduce the amount awarded in the judgment to the sum of $321,152.93, with interest at the rate of 6% per annum from August 4, 1960 to the date of entry of judgment, and as so modified, the judgment should be affirmed, without costs or disbursements to either party.

Settle order on notice, including proposed modified findings of fact and conclusions of law.

STEUER, J. (dissenting). On October 28, 1957, the parties entered into a written contract which was formally and carefully drawn. The contract involved a transfer of plaintiff's stock in Spear & Company, a New Jersey corporation engaged in the furniture business, on terms which will be set out below. Plaintiff was the major stockholder of Spear. The capitalization of Spear and plaintiff's ownership was:

| Type of Stock: | Common | First Preferred | Second Preferred |
|---|---|---|---|
| Issued and Outstanding | 248,026 | 9,439 | 16,034 |
| Shares Owned by Plaintiff | 129,682 | 0 | 13,283 |
| % of Issued Stock | 52.285 | 0 | 82.83 |

Defendant also was the owner of a substantial number of Spear shares.

At the time all of plaintiff's stock was pledged as collateral security for a loan in the principal sum of $275,000 to Standard Financial Corp. The loan was overdue and the collateral subject to foreclosure. Also, Southern Bedding Accessories Co., a supplier of Spear, had a judgment against both the parties for $382,325.50, and defendant had judgment over against the plaintiff for this sum. In addition, the first preferred stock had provisions for liquidation of the company and these stockholders were in a position to exercise their rights. It was against this background that the agreement of October 28, 1957, was made.

By its terms plaintiff transferred all his stock to defendant, with the proviso that defendant was to be the "sole and absolute

---

* Emphasis ours.

owner " thereof. The stock is described in the agreement as Spear Equity stock, and the term will be so used in this opinion. A supplementary agreement of the same date, which further indicates defendant's absolute ownership and control, gave him the right to merge or consolidate with Spear another company in the same business, Acme-Hamilton Manufacturing Corp. Defendant's brother was then the principal stockholder of Acme (later defendant acquired 78% of the stock), and it is clear that defendant's purpose in entering the agreement was to obtain two things for Acme from Spear, namely: Spear was listed on the American Stock Exchange, while Acme was not; Spear had a substantial tax loss which the contemplated merged company could take advantage of.

In return for the transfer to him, defendant agreed to satisfy the Southern Bedding judgment, to pay off the Standard Financial loan, and to acquire so much of the first preferred stock as was needed to avoid the threat of action by those shareholders and to release a judgment defendant had against plaintiff in the sum of $382,325.50. Defendant further agreed that, in the event Spear paid a dividend, one third of the amount received by him as dividends on the stock transferred would be paid by him to the plaintiff. He further agreed that in the event he desired to sell any of this stock, he would first tender it to plaintiff at the price for which he had received an offer to sell. Lastly, he agreed that if and when he sold any of the Spear Equity stock, it would be credited against the sum he was required to expend to acquire the stock; and, of any moneys he received from such sales in excess of this amount, he was to pay plaintiff one third.

Defendant did make the payments and received the stock. Thereafter he exercised the conversion privileges of both classes of preferred stock. He also voted his stock to increase the number of shares at a rate of approximately 4 for 1. A merger was effected with Acme-Hamilton. Plaintiff protested all these steps, though it is difficult to see on what grounds.

At the conclusion of these transactions, the Spear Equity stock held by defendant amounted to 793,808 shares. They had cost him $736,138.35. This sum was made up as follows:

| | |
|---|---|
| Paid to Southern Bedding | $382,696.04 |
| Paid to Standard Financial | 298,093.90 |
| Interest on sums borrowed | 55,098.41 |
| Stamp taxes | 3,212.00 |
| Legal expense | 250.00 |
| | $739,350.35 |

Special Term allowed interest only to the amount of $28,298.47. The agreement provides that defendant is to be reimbursed before plaintiff is to share in the proceeds for "any expenses paid by Kahn (and any interest paid thereon) and which are directly related to the ownership of the Spear Equity." Special Term's failure to give effect to this provision of the agreement was based on an unrelated clause in the agreement which provided that no interest was to be payable on the Southern Bedding judgment. The interest was on a loan made to finance the payment and should have been allowed just as similar interest in connection with financing the Standard Financial loan was allowed. Actually, the payment of these sums was nowhere disputed and the failure to allow the credit is clearly erroneous. The finding should be corrected accordingly.

Thereafter defendant made several trades in the Spear Equity stock. As to one sale, tender was made to plaintiff, and as to others it was not. The sale where tender was made was for 100,000 shares at $2.50 per share. Subtracting the shares and the sum realized, defendant's position was that he held 693,808 shares and his net cost was $489,350.35.

The Spear Equity shares sold without notice amounted to 308,225. For these defendant received $478,720.63. An additional sum would have to be added to the amount received because 26,450 of these shares were gifts to defendant's family. Special Term rightfully made a charge for these shares to the fund because, even though defendant purported to substitute nonequity stock, this was not a performance under the contract and he is chargeable with what those shares would realize. By taking the maximum price for defendant's sales of Spear Equity nearest to the date of these gifts, the price would be $18,468.75, raising the total receipts to $497,189.38.

Due, however, to the fact that defendant did not comply with his contract by tendering these shares to plaintiff, the amount of his receipts should be increased by whatever damage plaintiff suffered by the breach. As no special damage was shown, Special Term rightfully concluded that this damage would be the difference between the market value of the stock and the price received on the dates of these transactions. But in calculating this amount, Special Term fell into error. The Spear Equity stock was so-called "control stock." It was not registered on the American Stock Exchange and could not be sold there. A buyer of this stock therefore did not have the easily marketable commodity that a buyer of registered stock would have. Instead, he would have to resort to private bargain should he wish to dispose of his investment. Special Term

was mindful of the distinction between the prices of the two kinds of stock. In calculating the market value of the unregistered stock Special Term rightfully took as a base the sales price of the registered stock on the exchange. Plaintiff offered no evidence of the market value of unregistered stock. Concededly, it would be difficult to do so, as defendant's stock was the sole source of this class of stock and defendant's sales the only ones that could be made, barring resales of the same stock, as to which there was no evidence. Defendant offered proof that sales of unregistered stock are highly individual transactions. That proof, which was not contradicted, showed that, as a general rule, sales of unregistered stock of large and stable corporations realize about 15% less than the current sales price on the exchange. In the case of cheap stocks, such as was here involved, the variation is between 30% and 60%. The court allowed for the variation by deducting 11.1 cents per share from the exchange price, this being the figure that the court found it would have cost the defendant to register the shares. This is an entirely unrealistic method of arriving at the proper amounts. The exchange price is naturally affected by the comparatively small number of shares available for trading. If the huge amount represented by listing all the unlisted shares were suddenly put on the market, the effect on a marginal stock could not but be a sharp reduction in price. Moreover, nothing in the agreement requires the defendant to list this stock, nor is there any reason to believe that the plaintiff would want him to do an act which would necessarily be so detrimental to his own interest. Furthermore, an additional error was made below. The court applied this formula to the 100,000 shares that were sold after tender, as to which shares no damages at all were permissible.

The court found a difference between the actual prices received and market value on the basis he used of approximately $.678 per share. After deducting the $.111 per share, the difference amounted to $231,525.97. Assuming the lowest percentage figure testified to by defendant's expert of a differential of 30%, the damage figure would be $18,451.99. This is slightly more than 3% of the amount actually received, and this lends credence to the expert's opinion that in these sales the best price obtainable was realized. Moreover, it is patent that this should be so. For every dollar that plaintiff might potentially lose by virtue of a sale below market, the defendant would lose two. The mere fact that plaintiff was willing to turn over to him his whole future hope of realizing anything from his investment indicates his confidence that defendant was a person who

knew values and would obtain them. The rehabilitation of the company which began to show results in 1960 indicates that this confidence was not misplaced.

The findings in regard to the overcharge are erroneous and should be reversed. The reversal of the finding would leave the accounting as follows:

| | |
|---|---|
| Original cost | $739,350.35 |
| Amount received | 747,189.38 |
| Balance | $ 7,839.03 |

Of this amount, plaintiff's one third would be $2,613.01. And there remain 385,583 shares of Spear Equity in defendant's hands subject to the terms of the agreement.

Special Term, however, found that defendant should have sold these 385,583 shares and charged defendant with the value thereof, as found, of $892,974.68. This extraordinary result was reached by charging defendant with sales of Spear stock which defendant had owned at the time of the agreement, or which he acquired after in transactions in no way connected with the agreement. Admittedly the court found that this stock was not Spear Equity stock and the agreement applied to Spear Equity stock only. Nevertheless, the court found that defendant was obligated to sell the Equity stock first and when he sold other stock the sale should be treated as if it were Equity stock. On just what theory this conclusion can be sustained escapes us. When this court ordered the accounting we found and defined the relationship of the parties (23 A D 2d 231). It was then decided that plaintiff was merely one having a beneficial interest in the Equity stock and not even a minority stockholder. It was further determined that an action for an accounting was appropriate despite the fact that no fiduciary relationship might exist between the parties (p. 236). We then decided that the complicated transactions between the parties made an accounting the feasible method of determining whether any sum was owing to plaintiff, and the mere fact that the result could be the entry of a money judgment only would not operate to defeat the action for an accounting. And it was pointed out that, being in equity, equitable relief could be had (p. 237). Whether the defendant was chargeable for sales of Spear stock other than Equity stock were matters that could be gone into (p. 243). But it was nowhere decreed or decided that the relationship of the parties or the transactions between them gave rise to any such charge.

The facts established effectively belie any such right. As indicated, the very purpose of defendant's substantial outlay

for the purchase of a virtually bankrupt concern was to rehabilitate it through the advantages to be realized by both companies to the merger. Defendant's absolute freedom to deal with the stock as he saw fit was not only a prime essential of the contract but was specifically provided in it in as strong and certain terms as words will allow. It is furthermore beyond cavil that this agreement was not made for plaintiff's benefit in that defendant undertook to act for him as a partner, trustee, or in any other fiduciary capacity. It was not, and cannot be, denied that defendant owned other stock of Spear beside the Spear stock, and it was clearly contemplated that he would acquire additional other stock by way of the first preferred and a large block then owned by Acme. No restrictions on his dealings in this stock were put in the agreement and it must be clear that none was intended.

Furthermore, there is nothing to indicate that plaintiff was under any obligation to dispose of the Equity stock at any time, and the implications are clearly the other way. He would naturally retain a very substantial portion of it as long as he was managing the affairs of the company, and there is absolutely nothing to show that this was to be a temporary affair.

The finding that there was some breach of some undescribed obligation in defendant's sales is completely without support in the record. It would serve no useful purpose to detail the nature of each of these transactions. One should be sufficient. It will be recalled that Acme owned a block of 77,785 shares of Spear stock, a substantial portion of which came from plaintiff in settlement of a suit against him by Acme. When the merger was effected, defendant obtained these shares and used 38,650 of them to sell to the employees of the merged company to increase their interest through participation in the corporate enterprise. Obviously this had nothing to do with plaintiff's interest in the Spear Equity, nor could it reasonably be expected that control stock would be used for this purpose. Yet, Special Term charged this sale against defendant as if it were a sale of the Equity stock.

An understanding of this contract compels the conclusion that, in accord with its express terms, the power of decision as to how this stock was to be used rested exclusively with the defendant. Upon the prior appeal this court recognized that the only limitation on that power was if the use amounted to a fraudulent disregard of the plaintiff's interest. There was no proof of any such action. The mere fact that defendant exercised his rights in a way that incidentally, and in the view of hindsight, did not accrue to plaintiff's best advantage, is of no significance and gives rise to no relief.

These parties were not strangers. The contract between them contains internal evidence of previous dealings of some duration and considerable magnitude. Plaintiff was no tyro. On the contrary, he was an experienced operator seeking to extricate himself as best he could from an almost impossible situation. To accord him far greater advantages than he is entitled to by law or fair dealing makes for neither good morals nor good sense.

The judgment should be modified by striking the findings and conclusions at variance with those reached and substituting appropriate findings, and as so modified affirmed, without costs.

BOTEIN, P. J., RABIN and McNALLY, JJ., concur in *Per Curiam* opinion; STEUER, J., dissents in opinion in which STEVENS, J., concurs.

Judgment modified on the law and on the facts to reduce the amount awarded in the judgment to the sum of $321,152.93, with interest at the rate of 6% per annum from August 4, 1960 to the date of entry of judgment, and, as so modified, the judgment is affirmed, without costs or disbursements to either party. Settle order on notice, including proposed modified findings of fact and conclusions of law.